IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| ANDREW MALON, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )  Civil Action No. 3:14CV671–HEH |
| FRANKLIN FINANCIAL CORPORATION, *et al.*, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION
**(Denying Plaintiff's Motion for Temporary Restraining Order
or Expedited Preliminary Injunction)**

This is a putative class action filed by a single minority stockholder, Plaintiff

Andrew Malon ("Plaintiff"), alleging violations of federal securities law and related state

law claims. The underlying controversy evolves from the negotiation of a merger

agreement between two Virginia-based financial institutions. Plaintiff now seeks to

enjoin a vote by Franklin Financial Corporation's ("Franklin") stockholders on its

proposed merger with TowneBank,[1] contending that Franklin's proxy statement is

misleading.

The case is presently before the Court on Plaintiff's Motion for Temporary

Restraining Order or Expedited Preliminary Injunction (ECF No. 38), filed November 19,

2014—approximately 100 days after the proposed merger was publically announced.

---

[1] Franklin Financial Corporation is a Henrico County based Virginia corporation which operates as the holding company for Franklin Federal Savings Bank. TowneBank is headquartered in Portsmouth, Virginia.

After the Court partially granted Plaintiff's Motion to Expedite Discovery and

Proceedings, enabling limited discovery, both parties filed detailed memoranda of law,

accompanied by exhibits, supporting their respective positions on the motion for

injunctive relief. After affording Defendants[2] a reasonable opportunity to file responsive

pleadings, the Court heard oral argument on December 1, 2014. This opinion hastily

followed.

     To provide context to evaluate Plaintiff's request for injunctive relief, some back-

story is necessary. The epicenter of the underlying controversy is the content and

adequacy of the Schedule 14A Definitive Proxy Statement (the "Proxy") filed by

Franklin with the Securities and Exchange Commission ("SEC") preceding a scheduled

stockholder vote. In essence, the plaintiff-stockholder maintains, in pertinent part, that

the Proxy, which is approximately 200 pages in length, with over 100 pages detailing the

mechanics of the proposed merger transaction, is misleading and incomplete. Plaintiff

contends that "the Proxy provides stockholders with materially misleading information

and fails to disclose material information critical to stockholders' ability to make an

informed decision on whether to vote in favor of the Merger." (Pl.'s Mem. Support of

Prelim. Inj. 8 (Pl.'s Mem. Support"), ECF No. 39.) Plaintiff also alleges that the merger

agreement undervalues Franklin's stock. (*Id.* at 6.) Finally, in Plaintiff's view, the

---

[2] The remaining defendants in this matter are Franklin Financial Corporation, Franklin Federal
Savings Bank, and Richard T. Wheeler, Jr., Hugh T. Harrison, II, Warren A. Mackey, Elizabeth
W. Robertson, George L. Scott, Richard W. Wiltshire, Jr., and Percy Wootton, as officers and
directors of Franklin. This Court dismissed TowneBank as a defendant by Order entered
November 24, 2014 (ECF No. 49).

judgment of the Franklin Board of Directors (the "Franklin Board" or "Board"), as well as its financial advisor, was infected with conflicts of interest. (*Id.* at 5.)

The immediate focal point of this case is a merger agreement, entered into on July 14, 2014, facilitating the proposed acquisition of Franklin by TowneBank. The anticipated $275 million transaction was publically announced on July 15, 2014. Under the terms of the contemplated merger, TowneBank would acquire all the outstanding shares of Franklin in a stock-for-stock transaction as valued on the date the deal closed. (Am. Compl. ¶ 3, ECF No. 17.) If consummated, Franklin stockholders will receive 1.400 shares of TowneBank stock for each share of Franklin stock that they own. Defendants valued the proposed transaction at $275 million in total, or $23.04 per Franklin share based on the closing price of TowneBank on the last trading date before the announcement of the proposed transaction. (*Id.*) The value of both Franklin and TowneBank stock has fluctuated in the interim.

Franklin filed its Schedule 14A Definitive Proxy Statement with the SEC on October 24, 2014, after filing its Preliminary Proxy Statement with similar content on September 17, 2014. The Franklin stockholder vote on the proposed merger is scheduled for December 3, 2014 at 11:00 a.m. (*Id.* at ¶ 4.) The proposed transaction is expected to close January 2, 2015. (Aff. of Richard T. Wheeler, Jr. ¶ 6 ("Wheeler Aff."), ECF No. 51-1.) As of November 25, 2014, 62% of Franklin's shareholders have already cast their votes, with 99% favoring the merger. (*Id.* at ¶ 24.) No other stockholder has expressed concerns about the sufficiency of the Proxy. (*Id.*)

3

While Plaintiff's request for injunctive relief centers on the adequacy of the Proxy, Plaintiff also maintains that the Franklin Board had conflicts of interest and breached their fiduciary duties in failing to include a provision in the agreement to lock-in the value of Franklin stock between the date of the merger agreement and the closing date—a so-called collar provision. In his Amended Complaint, Plaintiff alleges that "Franklin's stock traded at a high of $24.60 per share on July 2, 2014, just before the announcement of the proposed transaction. Since the deal was announced, Franklin's stock has steadily declined – trading at a low of $18.52 per share on September 30, 2014." (Am. Compl. ¶ 6.) Additionally, Plaintiff points out that "since the announcement of the Proposed Transaction, TowneBank's stock price has tumbled – from a closing price of $16.64 per share on July 14, 2014 to its 52-week low of $12.93 per share on September 8, 2014." (*Id.* at ¶ 9.) The net effect, according to Plaintiff, was to bring "the aggregate value of the deal down to $216 million" from the initial valuation of $275 million. (*Id.*) In Plaintiff's view, given the reduction in stock value, the proposed consideration is inadequate. (*Id.* at ¶ 10.)

Plaintiff also takes issue with several elements of the merger agreement designed to limit "other bidders from making a successful competing offer for the company." (*Id.* at ¶ 11.) According to Plaintiff, these protective measures (1) precluded Franklin from soliciting other potential acquirers during the course of negotiations; (2) required notification of TowneBank of any unsolicited bona fide proposals; and (3) allowed TowneBank to provide a matching competing proposal in the event of an unsolicited offer from another entity. (*Id.*) Plaintiff also implies that the Board and executive

4

officers of Franklin breached their fiduciary duties by agreeing to vote their shares in favor of the proposed transaction. (*Id.* at ¶ 12.) He infers that these provisions, which are apparently common in merger agreements, are not in the stockholders' best interest.

With respect to the Proxy, which Plaintiff maintains is misleading and omits information critical to the exercise of reasoned judgment by a voting stockholder, he focuses on four general areas. These include the failure of management to disclose the details of several financial forecasts relied upon in the Board's decision to enter into the merger agreement, alleged conflicts of interest on the part of Franklin's financial advisor, the omission of material information used in the financial advisor's Pro Forma Financial Impact, Selected Companies, and Selected Transactions Analyses, and the failure to include other details of the merger process. On close review of the Amended Complaint, Plaintiff does not contend that the Proxy fails to mention any of these alleged deficiencies. Instead, Plaintiff contends that a reasonable stockholder reviewing a nearly 200-page proxy statement would need more detailed amplification of these areas to make an informed decision. In his view, the failure to provide such exhaustive detail renders the disclosures misleading. Accordingly, Plaintiff seeks to enjoin the stockholders' vote until such information is disclosed. At this time, no other stockholder has stepped forward to join this litigation.

Motions for preliminary injunctive relief are reviewed under the well-established standard restated succinctly by the United States Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tip in his favor, and that an injunction is in the public's best interest." *Id.* at 20. In writing for the Court in *Winter*, Chief Justice Roberts noted that, "[a] preliminary injunction is an extraordinary remedy never awarded as of right. . . . In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (quoting *Weinberger v. Romero-Barcello*, 456 U.S. 305, 312 (1982)).

The analytical framework for applying the teachings of *Winter* was clearly articulated by the United States Court of Appeals for the Fourth Circuit in *Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d. 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371 (2010). The Fourth Circuit instructed trial courts to employ the "balance-of-hardship test." "The first step in a Rule 65(a) preliminary injunction situation is for the court to balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant." *Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co.*, 550 F.2d. 189, 195 (4th Cir. 1977). If the balance of hardship tips in Plaintiff's favor, the court then turns to plaintiff's likelihood of succeeding on the merits. *Id.*

Obviously, postponing the shareholder vote would entail significant hardship to Franklin, which has undoubtedly expended considerable money and time to arrange the process. If Franklin is required to file and distribute a supplemental proxy, it will incur additional expenses and attorneys' fees to appease a single shareholder with only a .0000276% interest. (Wheeler Aff. ¶ 20.) The merger with TowneBank is the only

viable pending offer on the table. (*Id.* at ¶ 8.) There is no assurance in a fluctuating market that the opportunity will remain available on the terms negotiated. This hardship is significantly aggravated by Plaintiff's delay in filing his motion seeking a preliminary injunction—fourteen days before the appointed date for the shareholder vote and twelve days before a hearing could be scheduled, with the intervening Thanksgiving holiday. Those seeking equity should do so with haste and dispatch. *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d. 75, 80 (4th Cir. 1989). Plaintiff has not done so.

Even though Plaintiff has failed to particularize the harm he will suffer, it is true stockholders theoretically face irreparable harm when they are required to make important voting decisions on the basis of inadequate proxy disclosures. *In re Netsmart Techs., Inc. Shareholder Litigation*, 924 A.2d 171, 207 (Del. Ch. 2007). However, in the immediate case, the Court is not confronted with a group of stockholders—only a single disgruntled stockholder with a *de minimis* ownership interest. Plaintiff has no warrant to cast his claim as one on behalf of all the stockholders; therefore, the Court is not persuaded that the balance of hardship tips clearly in Plaintiff's favor.[3]

In evaluating a motion for preliminary injunction, this Court must weigh all considerations articulated in *Winter*.[4] But as the Supreme Court also cautioned in *Winter*, a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is

---

[3] Given the fractional interest owned by Plaintiff, 373 out of 11,776,750 outstanding shares, a compelling argument could be made that he has an adequate remedy at law foreclosing injunctive relief. *See Hughes Network Sys. v. Interdigital Commc'n Corp.*, 17 F.3d 691, 699 (4th Cir. 1994).
[4] The adequacy of the Proxy is measured by Section 14A of the Securities Exchange Act and the Rules promulgated thereunder. 17 CFR 240.14A-9; 15 U.S.C. §§ 78n, 78t, 78u. The decision-making process of the Franklin Board is governed by the Virginia Stock Corporation Act. Va. Code § 13.1-691, *et seq.*

entitled to such relief." 555 U.S. at 22; *see also Dewhurst v. Century Aluminum Co.*, 649 F.3d 297, 290 (4th Cir. 2011). This standard applies to both the likelihood of suffering irreparable harm and the likelihood of prevailing on the merits at trial. *League of Women Voters N.C. v. North Carolina,* 769 F.3d 224, 250 (4th Cir. 2014). After reviewing the pleadings and hearing the argument of counsel, the Court is of the opinion that Plaintiff has failed to demonstrate a clear showing that he is likely to succeed on the merits or suffer irreparable harm. Even though Plaintiff trips on the first hurdle, out of an abundance of caution, the Court will explain its assessment of the merits.

In the Commonwealth of Virginia, the fidelity with which a corporate director discharges his or her duties is not measured by "what a reasonable person would do in similar circumstances or by the rationality of the ultimate decision. Instead, a director must act in accordance with his/her good faith business judgment of what is in the best interest of the corporation." *Willard v. Moneta Bldg. Supply Inc., et al.*, 258 Va. 140, 151 (1999).[5] The standard by which a director is to discharge his or her duties is delineated in Virginia Code § 13.1-690(A). If a director acts in accordance with that standard, Virginia Code § 13.1-690(C) provides a "safe harbor" that shields a director from liability for any action taken as a director, and for failure to take action. *Commonwealth Transp. Comm'r v. Matyiko*, 253 Va. 1, 6 (1997). Employing this standard, the Supreme Court of Virginia has held that section 13.1-690 does not require a director to maximize profits by accepting the highest bid when selling the assets of a corporation. *Willard,* 258 Va. at

---

[5] Since the analysis of Plaintiff's substantive state law claims at this stage is limited to a strength assessment weighing his entitlement to preliminary injunctive relief, the Court will assume that Plaintiff has standing—at this stage only—as to those counts.

150. The wisdom of the Board's action is contextually viewed with all aspects of the deal factored into the equation.

The record evidence at this stage does not demonstrate that the Franklin Board failed to engage in an informed decision-making process or cast sage judgment into the wind. The Proxy details various meetings, both formal and informal between 2012 and 2014, of the Board and its chief operating officer ("CEO"), regarding a potential sale of Franklin after the expiration of the three-year post-mutual-to-stock conversion period. (Proxy 47–51.) The Board held at least four formal strategic planning meetings in 2012 and 2013 at which Franklin's financial advisors and legal counsel reviewed available options with the Board members. (*Id.* at 27.) Once the Board began entertaining the possibility of a merger in 2013, Franklin representatives began meeting with financial advisors regarding Franklin's valuation, projections, performance trends, strategic options, and the national and Southeast markets for merger and acquisition transactions. (Proxy 48.)

Additionally, "[d]uring 2013 and 2014, Franklin's CEO met informally with the chief executive officers of four financial institutions, each of whom expressed interest in talking more formally with Franklin should it decide to pursue a sale," and between January and April of 2014, he had similar discussions with officers of six institutions. (*Id.* at 47–48). In April 2014, the Board formally engaged a financial advisor and formed a merger committee. (*Id.* at 48.) Franklin collaborated with its financial advisor to identify qualified financial institutions likely to have an interest in a potential merger with Franklin. (*Id.*) Franklin's financial advisor met with seven such institutions, including

TowneBank. (*Id.* at 49.) Following these discussions, the Board held a series of meetings to discuss potential opportunities. (*Id.* at 49–50.)

On June 30, 2014, the Franklin Board, along with its legal and financial advisors, met to discuss all potential merger options, including TowneBank's offer of an all-stock transaction with a proposed fixed exchange ratio of 1.375. The Board extensively discussed the efficacy of each offer, and also considered whether it was in Franklin's best interest to proceed independently. After further negotiations and careful deliberation, the Board requested that TowneBank revise its offer to include an exchange ratio of 1.400. When they complied, the Board decided that it was in Franklin's best interest to negotiate exclusively with TowneBank. While Plaintiff may deem the transaction more desirable if it yielded a greater return on his money, this Court concludes that the Franklin Board's recommendation of the merger agreement appears to be a defensible business decision premised on their good faith perception of the best interests of the corporation. The Proxy presents the reasoning underlying the decision of the Boards of Directors of both Franklin and TowneBank to approve the merger, as well as a thorough assessment of the risk factors associated with that decision. (*Id.* at 51–54). Furthermore, the consideration offered to the Franklin stockholders by TowneBank—1.400 shares of TowneBank common stock per share of Franklin common stock—is fully disclosed in the Proxy, and the per-share value of the shares of each corporation is a matter of public information.[6] Thus, it appears the stockholders have all the information necessary to cast an informed

---

[6] Franklin trades on the NASDAQ Global Select Market under the symbol FRNK. (Wheeler Aff. ¶ 5.) TowneBank is listed on the NASDAQ Russell 300 Index under the symbol TOWN. (Aff. of G. Robert Aston, Jr. ("Aston Aff."), Ex. A at 1, ECF No. 51-3.)

vote, and Plaintiff's claims that the Franklin Board breached their fiduciary duties appear unlikely to succeed on the merits.

Plaintiff's suggestion that the judgment of the Franklin Board was tainted by conflicts of interest appears to stand on equally tenuous footing. The fact that Board members will receive a number of post-merger benefits, such as cash payments for vested and unvested stock options and director appointments, is disclosed in the Proxy. (Proxy 74–77.) Most such compensation benefits were pre-existing contractual obligations affected by the merger. (Wheeler Aff. ¶ 19.) The Proxy includes a section entitled, "Interests of Certain Franklin Directors and Executive Officers in the Merger," which spans over four pages disclosing such individuals' interests, and their consideration of those interests, in approving and recommending the merger. (Proxy 74–77.) For instance, the Proxy indicates that upon consummation of the merger, TowneBank will establish the TowneBank Richmond Board, to which Franklin's current CEO and potentially other Franklin Board members will be appointed. (*Id.* at 75.) Additionally, the Proxy details the precise amounts Franklin's executive officers will receive in severance benefits and "Golden Parachute Compensation," along with the formula which will be used for converting the stock options of certain employees, officers and directors. (*Id.* at 75–76.) The number of common shares beneficially owned by each Franklin director and executive officer is also disclosed. (*Id.* at 107.) These benefits do not appear atypical of a transaction of this type and the disclosure in the Proxy appears sufficient to place voting stockholders on notice of any potential conflicts of interest. Consequently, it is unlikely on the record evidence that Plaintiff could elevate this

suggested impropriety to an actionable breach of any fiduciary duty or Exchange Act claim.

Turning next to the allegedly material omissions from the Proxy,[7] it is important at this threshold to tease out information critical to an informed decision by a stockholder from that which would simply be nice to know. A misrepresentation or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). "To prevail in a private cause of action asserting a violation of Rule 14a-9, a plaintiff must show that (1) the proxy statement contained a material misrepresentation or omission; (2) that caused the plaintiff injury; and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction." *Haynes v. Crown Cent. LLC*, 78 F. App'x 857, 861 (4th Cir. 2003) (citing *Gen. Elec. Corp. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992)).

The first category of information purportedly omitted from the Proxy involves financial forecasts and projections prepared by Franklin management personnel. Although the Proxy includes management-prepared projections of net interest income, total non-interest income, total non-interest expenses, provision for loan losses, and net

---

[7] Section 14(a) of the Exchange Act makes unlawful the solicitation of a proxy, by way of interstate commerce, in contravention of the rules and regulations prescribed by the SEC. 15 U.S.C. § 78n(a). SEC Rule 14a-9 provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Pursuant to Section 20(a) of the Exchange Act, controlling persons may be held liable for violations Section 14(a) and Rule 14a-9. 15 U.S.C. § 78t.

income, Plaintiff faults the Proxy's omission of projected unlevered free cash flows, projected total asset balances, and projected earnings per share ("EPS") multiples—concepts probably foreign to the average stockholder. Plaintiff contends that such information is essential for stockholders to accurately gauge the value of their shares and weigh the wisdom of Franklin's financial advisor. Courts have consistently held that the duty of disclosure does not extend to the provision of information so extensive and detailed as to permit stockholders to make an independent determination of fair value or recreate the analysis of a financial advisor. As the Supreme Court of Delaware noted in *Skeen v. Jo-Ann Stores, Inc.*, "[o]mitted facts are not material simply because they might be helpful [and shareholders are not entitled to demand] . . . all the financial data they would need if they were making an independent determination of fair value." 750 A.2d 1170, 1174 (Del. 2000).

With respect to Franklin's unlevered free cash flows, Plaintiff complains that because Franklin's financial advisor relied upon those figures in performing a discounted cash flow ("DCF") analysis, omission of those figures is material. Although the Supreme Court of Virginia has never addressed this issue directly, under Delaware law, which Plaintiff urges this Court to follow, stockholders are entitled to no more than a fair summary of the financial advisor's work. *See In re Pure Resources, Inc., Shareholders Litigation*, 808 A.2d 421, 450 (Del. Ch. 2002); *see also In re Checkfree*, 2007 WL 3262188 (Del. Ch. 2007). Here, the Proxy statement includes the entire fairness opinion rendered by Franklin's financial advisor (Proxy, App'x C), as well as the opinion rendered by TowneBank's financial advisor. (Proxy, App'x B.) While it appears to the

13

Court that the Proxy itself provides, as required, a fair summary of the analysis of Franklin's financial advisor, inclusion of the financial advisor's full fairness opinion would cure any deficiency that may exist.

As for the projected total asset balances, Plaintiff argues that disclosing the projected net income without the projected total assets paints an unduly pessimistic financial picture. Plaintiff argues that omission of projected total assets skews the significance of projected net income; and thus, omission of this estimate renders the proxy misleading. But as the name implies, projected data is *per se*, an estimate. Plaintiff provides no indication of how this alleged undue pessimism as to a single data point renders the entire Proxy materially misleading. Once again, shareholders are entitled to no more than a fair summary of the financial advisor's work. *Skeen*, 750 A.2d at 1174; *Gottlieb v. Willis*, 2012 WL 5439274, at *6 (D. Minn. 2012).

Next, Plaintiff faults the Proxy for not containing projected stock price to EPS multiples for 2014 and 2015. The Proxy discloses the ratio for the last twelve months ("LTM"), but omits the same projection for 2014 and 2015, which Plaintiff contends were available to the financial advisors for both Franklin and TowneBank. The EPS projections for 2014 and 2015, according to Plaintiff, were considered by Franklin's financial advisor in its fairness analysis, and so the stock price to EPS multiples could have been included in the Proxy. Plaintiff concludes, "the EPS projections are material to a stockholder's evaluation of the financial fairness of the Merger and should have been disclosed in the Proxy." (Pl.'s Mem. Support 13.) While such information may have provided some insight into the fairness calculus used by the financial advisor, it falls far

14

short of necessary to enable the stockholders to make an informed decision. It appears

the Franklin stockholders were provided with a fair summary of the data underlying the

conclusion of Franklin's financial advisor, in addition to the entirety of that advisor's

fairness opinion. Stockholders are not entitled to the extensive financial data necessary to

recreate the financial advisor's determination of fair value. This Court is not convinced

that Plaintiff could clearly demonstrate that the financial forecasts presented in the Proxy

are false, misleading, or omit material facts, or that Franklin's decision to include

mathematically certain figures rather than future estimates renders the proxy misleading.[8]

Turning next to the Pro Forma Financial Impact Analysis prepared by Franklin's

financial advisor, Plaintiff's expert opines that the Proxy's summary of the analysis is

misleading "by failing to disclose certain unduly pessimistic assumptions used by [the

financial advisor]." (Pl.'s Mem. Support 17.) Plaintiff maintains that given Franklin's

reduced credit mark, a "reasonable stockholder may consider these [] assumptions in light

of Franklin's improved circumstances, and draw the conclusion that the Pro Forma

---

[8] Plaintiff also criticizes other aspects of the fairness analysis prepared by Franklin's financial advisor—namely, the *Selected Companies* and *Selected Transaction* analyses. (Proxy 68–72.) His expert points to discrepancies in financial data in the financial advisor's analysis and information contained in Franklin's historical financial statements without further explanation. The expert also impugns the valuation analysis methodology employed by Franklin's financial analyst. On pages 68 through 73 of the Proxy, Franklin's financial advisor compares financial information pertaining to Franklin with thirty-three (33) other financial institutions and TowneBank with eleven (11) other similar banking organizations. In its analysis, the financial advisor focuses on minimum, average, medium, and maximum figures. Plaintiff's expert maintains that those data points disclosed by Franklin's financial advisor are inadequate and all of the figures corresponding to each company and transaction analyzed should be included. However, much of the financial information utilized, as well as most if not all the underlying data, appears to be publically available. Moreover, while the additional data points suggested by Plaintiff's expert may be of value to a financial analyst, it is doubtful they would inform the decision of a reasonable shareholder.

Financial Impact Analysis actually supports the financial *unfairness* of the Merger

Consideration offered in the Merger." (*Id.* at 17–18) (emphasis in original). Aside from

the speculative nature of Plaintiff's expert's conclusions, any possible misconception on a

stockholder's part would be allayed by referring to the financial advisor's report itself—

which is appended to the Proxy.

It is also important to keep in mind in assessing the weight to be given to

assumptions and projections that they are—as the label implies—no more than

assumptions and projections—not concrete facts. Their accuracy is predicated on

uncertain future events, as opposed to current facts. While there appears to be

disagreement among the federal circuits as to the disclosure of financial projections, there

appears to be a consensus that current data that is mathematically certain should be given

more weight than projections. Of course in disclosing any estimate, material underlying

facts that may affect the accuracy of the projection must be disclosed. But due to the

uncertainty associated with future projections, their disclosure is often considered

misleading and their omission is rarely considered material in proxy statements. *Walker*

*v. Action Indus.*, 802 F.2d 703, 709 (4th Cir. 1986).

On another front, Plaintiff contends that the Proxy fails to fully disclose what

Plaintiff perceives to be a potential conflict of interest on the part of Franklin's financial

advisor. Plaintiff asserts that:

> The Proxy misleadingly states that [Franklin's financial advisor] will
> collect "a total cash fee of approximately 1% of the aggregate merger
> consideration, of which a portion became payable to [Franklin's financial
> advisor] upon the rendering of the opinion, and the majority of which is
> contingent upon the consummation of the merger." (Proxy at 74.)

> However, this disclosure is materially incomplete and misleading as a
> reasonable investor may assume that the amount of [Franklin's financial
> advisor's] contingent fees are merely 51% of its aggregate fees, when in
> fact, the contingent amount is actually much higher.

(Pl.'s Mem. Support 13–14.)

A potential erroneous assumption by a stockholder is not the equivalent of a material false statement or omission. It appears to be the prevailing view that a proxy need only disclose that a financial advisor's fees are contingent. *Centy. of York Emps. Ret. Plan v. Merrill Lynch & Co.*, 2008 WL 4824053, at *11 (Del. Ch. October 28, 2008); *see also Gottlieb*, 2012 WL 5439274, at *6 (D. Minn. 2012). Delaware courts, which again Plaintiff urges this Court to follow, have "held that the precise amount of consideration need not be disclosed, and that simply stating that the advisor's fees are partially contingent on the consummation of a transaction is appropriate." *Centy. of York*, 2008 WL 4824053 at *11. Although the Proxy does not provide the level of detail Plaintiff believes to be appropriate, it does provide the stockholder with a mathematical methodology to approximate the financial advisor's compensation: a total cash fee of approximately one percent (1%) of the aggregate merger consideration. (Proxy 74.) In fact, the cover letter accompanying the Proxy approximates the financial advisor's fee to be roughly $2.6 million, substantially all of which is contingent on the deal closing. This amount, of course, is dependent upon the value of TowneBank's stock at the time the merger is consummated, but the disclosure is sufficient to allow a reasonable stockholder to assess the potential conflicts of interest that could impact the financial advisor's opinion.

17

Plaintiff identifies a number of other alleged deficiencies in the Proxy relating to details of the negotiation process and the Board's deliberations. Specifically, Plaintiff contends that Franklin should have explained in the Proxy (1) why it failed to negotiate a collar provision insulating Franklin's stock from value reduction pending closure of the transaction; (2) why TowneBank reduced its initial offer after additional on-site due diligence; and (3) why the Proxy doesn't explain what banks Franklin targeted as potential buyers and why those banks did not follow up, as well as the identities of those institutions whose offers the Board chose not to pursue.

Perhaps in hindsight, a collar provision could have been beneficial, but as discussed above, the Franklin Board had no duty under Virginia law to maximize the price in connection with the merger. Their statutory responsibility was to exercise good faith business judgment. Just as Plaintiff may speculate that the Franklin Board never considered a collar provision,[9] it is equally plausible that had Franklin demanded a collar provision, TowneBank may have altered other terms of the deal in a manner less favorable to Franklin stockholders. With only a single merger offer, Franklin's negotiating strength was limited. Furthermore, the fluctuation in the share prices of Franklin and TowneBank stock between the date of the merger agreement and the closing date of the deal is a matter of public record. Armed with this information, an informed shareholder has the option of voting against the merger if he or she believes the

---

[9] Plaintiff refers to the minutes of only two meetings of the Franklin Board in support of his argument that Franklin failed to negotiate for a collar provision. This evidence is insufficient, and borders on disingenuous, to conclude that the Franklin Board failed to consider a collar provision at any point throughout, what appear to the Court to be, extensive negotiations of the terms of the proposed merger.

consideration offered is inadequate. So far, only one percent (1%) has voted to reject the offer. (Wheeler Aff. ¶ 24.)

Plaintiff's argument that the Proxy should disclose why TowneBank reduced its initial offer and what other banks were targeted by Franklin as potential buyers, pushes Plaintiff's perception of Proxy requirements beyond the outer limits. Neither relevant case law nor logic would necessitate that a proxy statement delve into such a subjective and conjectural realm. Simply because Franklin and its financial advisor identified an institution as a potential buyer, does not mean that institution had any actual interest. The identification in the Proxy of other banks Franklin targeted as potential buyers who expressed no interest is immaterial under any reasonable standard of measure.[10]

Finally, Plaintiff finds fault with the failure of Franklin to disclose in the Proxy—or to advise stockholders—that the *Virginian-Pilot*, a newspaper of general circulation in Virginia's Tidewater region, had reported an investigation into potential conflicts of interest and the resignation of some TowneBank directors. Assuming that such information was material, Franklin would have no obligation to address it in the Proxy statement. Franklin's responsibility is to disclose information that is not otherwise available in the public domain. *Hillson Partners Ltd. P'Ship*, 42 F.3d at 212 (citing *Sailor v. Northern States Power Co.*, 4 F.3d 610, 613 (8th Cir. 1993)). Furthermore, disclosure of such unsubstantiated allegations is not required, as "[w]ide authority

---

[10] The Proxy does describe another company, "Company A," that tendered an initial indication of interest in merging with Franklin. Company A's proposal was delivered to Franklin almost a month past Franklin's requested deadline. The Proxy discloses existence of that offer and enough detail for the reasonable stockholder to recognize that Company A's proposal was of a different character than TowneBank's proposal. (Proxy 49). Its rejection was well within the Board's discretion.

establishes that while pending litigation may be material under certain circumstances, the mere possibility of litigation is not." *Gen. Elec.*, 980 F.2d at 935. The Proxy discloses all pending litigation—specifically, this suit—that may affect the merger. *Id.* at 936.

In the final analysis, Plaintiff's request for injunctive relief fails to clearly demonstrate the requisite entitlement to such extraordinary remedy. Initially, Plaintiff urges this Court to adopt a disclosure requirement that is both unrealistic and beyond the grasp of even well-educated investors. While prevailing standards assume some sophistication on the part of the reasonable stockholder, Plaintiff elevates useful information to the stature of essential to an informed decision. Despite Plaintiff's insistence to the contrary, he identifies no information contained in the Proxy that is materially misleading, or any omitted facts that are truly material.[11] Mere relevance is insufficient to trigger a duty to disclose. An omitted fact is material if there is a substantial likelihood a reasonable shareholder would consider it important in deciding how to vote. *TSC Indus.*, 426 U.S. at 449. This is not the sort of situation where stockholders have only a banker's unadorned opinion of the deal and the market price of the stock to judge the adequacy of the proposed merger. Here, Franklin stockholders have approximately 200 pages of detailed financial data on which to base their decision. The minutia Plaintiff contends should have been disclosed in the Proxy seems too abstract to enlighten the typical stockholder. *See Roberts v. Gen. Instrument Corp.*, C.A. No. 11639, 1990 Del.Ch. LEXIS, at *36 (Del. Ch. Aug. 13, 1990). This Court is,

---

[11] Conspicuously absent from the record is an affidavit by Plaintiff explaining how the alleged omitted disclosures would inform his vote, that he has personally read the Proxy, and that he has a fundamental understanding of the technical concepts about which he seeks further information.

therefore, of the opinion that Plaintiff has failed, as well, to make a clear showing that he is likely to succeed on the merits.

Having found that Plaintiff is unable to demonstrate either a clear showing of irreparable harm or a likelihood of prevailing on the merits, Plaintiff's Motion for Temporary Restraining Order or Expedited Preliminary Injunction will be denied. An appropriate Order will accompany this Memorandum Opinion.

                                                   /s/
                                              Henry E. Hudson
                                              United States District Judge

Date: Dec. 2, 2014
Richmond, Virginia